IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ISAIAH MCCOY,<br><br>Defendant. | Case No. 23-cr-00085-DKW-KJM<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL** |

On April 22, 2025, a federal jury convicted Defendant Isaiah McCoy of fourteen counts, including: one count of sex trafficking a minor/sex trafficking by force, fraud, or coercion;[1] three counts of sex trafficking by force, fraud, or coercion; seven counts of interstate travel or transportation in aid of racketeering enterprises; two counts of obstructing a sex trafficking investigation; and one count of transportation for purposes of prostitution.  Dkt. Nos. 451 & 452.  McCoy now moves *pro se*[2] for a new trial on all counts,[3] contending that: (1) the Court

---

[1] Count One was charged in two ways: (1) sex trafficking of a minor; and (2) sex trafficking by fraud, force, or coercion.  *See* Dkt. No. 1 at 2.  McCoy was convicted of both.  *See* Dkt. No. 452 at 1–2.

[2] Because McCoy is *pro se*, the Court liberally construes his filings.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[3] McCoy initially moved for a new trial on Count One (sex trafficking of a minor) only.  *See* Dkt. No. 465 at 13.  In his May 27, 2025 reply brief, however, he changes course and requests that the Court "grant a new trial with regards to ALL charges."  *See* Dkt. No. 481 at 1, 14.  Indeed, McCoy alternatively refers to his reply brief as both "defendants [sic] reply to the government's opposition" and an "Amended Motion."  *Id*. at 1, 16.  Although such an expansion violates Federal Rule of Criminal Procedure 33(b)(2) by challenging different counts on different

baselessly deprived him of schedule continuances, thereby undermining his ability to present a complete defense; (2) the Government "ambushed" him with Minor Victim 1's (aka "Leimomi") testimony; (3) the Government misstated the law during its closing arguments and improperly appealed to the (mostly female) jury's emotions; (4) the jury's "split verdict" revealed a "severe conflict" and fundamental misunderstanding as to the law; and (5) the jury's verdict was "outlandish" in light of the evidence adduced at trial. Dkt. Nos. 465 & 481. Each of these arguments, however, is flatly contradicted by the record, including the evidence presented at the two-week trial over which the undersigned presided. McCoy's motions for a new trial, Dkt. Nos. 465 & 481, are therefore DENIED, as more fully explained below.

## FACTUAL & PROCEDURAL BACKGROUND[4]

On October 26, 2023, a federal grand jury indicted Defendant Isaiah McCoy on eighteen counts, including: (1) one count of sex trafficking of a minor/sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), (b)(2), and (c); (2) four counts of sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1); (3) nine counts of interstate

grounds outside of the 14-day limitations period, and while the Government would normally, at a minimum, be afforded an opportunity to respond in writing to McCoy's new contentions, the arguments presented are patently meritless and require no additional briefing.
[4]The Court presumes the parties' familiarity with the procedural and factual background of this case and, thus, sets forth only the background necessary for an understanding of the instant issues.

travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C.
§ 1952(a)(3)(A); (4) three counts of obstructing a sex trafficking investigation in
violation of 18 U.S.C. § 1591(d); and (5) one count of transportation for purposes
of prostitution in violation of 18 U.S.C. §§ 2421(a) and 2.  Dkt. No. 1.

Trial was initially set for April 2, 2024.  Dkt. No. 24.  On March 5, 2024—
less than a month prior to trial—McCoy indicated that that date was no longer
feasible and that he would seek a continuance.  *See* Dkt. No. 66 at 5; *see also* Tr. of
Mar. 7, 2024 Hearing at 57:2–7, Dkt. No. 166 (confirming same).  Although the
Government was prepared to stipulate to a continuance, *see* Dkt. No. 93, McCoy
would not agree.  The parties thus appeared before the Court on March 22, 2024 to
resolve the issue, *see* Dkt. No. 268 at 3–4.

At the March 22, 2024 hearing before the then-presiding judge,[5] despite
asserting that it was "obvious that [the trial date] need[ed] to be moved," McCoy
"whipsawed" the Court—indicating both that he was not prepared to go to trial on
April 2, 2024 and that he did not consent to a continuance because his lack of
preparation was due to the Government "not giving [him] the discovery that [he
was] entitled to have."  *See* Tr. of Mar. 22, 2024 Hearing at 11:1–15, 17:1–10,
19:22–22:19, 25:13–31:20, Dkt. No. 109.  Following an hour of back-and-forth
discussions, the Government moved for a continuance, and the Court granted it

---

[5] Senior United States District Judge Susan Oki Mollway.

over McCoy's objection, thereby re-setting trial for July 1, 2024. *See id.* at 27:5–
34:13; Dkt. Nos. 99 & 141.

In the leadup to the July 1, 2024 trial date, McCoy once again began
representing that he was unprepared to go to trial and would need a continuance
until January 2025. *See* Dkt. No. 183 at 8; Dkt. No. 214 at 2; Dkt. No. 215 at 1.
But, as before, while the Government was willing to stipulate to a new trial date,
McCoy refused to sign the same—even though it would have given him the relief
he sought. *See* Dkt. No. 214 at 2–3; Dkt. No. 215 at 1–2, 4. Presented with these
conflicting messages, the Court elected to rely on McCoy's "unequivocal
agreement (placed on the record at the hearing on May 10, 2024) to the
continuance of the trial to January 14, 2025" and re-set trial for that date. Dkt. No.
215 at 4; *accord* Dkt. No. 214 at 3; Dkt. Nos. 211 & 221.

On September 4, 2024, McCoy again sought a continuance of the trial date,
representing that it was "necessary in order to ensure adequate and effective
preparation of the defense in this case," including with respect to his recent
retention of a private investigator and pending efforts to retain a new paralegal and
legal experts.[6] Dkt. No. 265-1 at 1. Over the Government's objection, *see* Dkt.
No. 268, the Court granted the motion and re-set trial for March 24, 2025, *see* Dkt.

---

[6]On August 30, 2024, this case was reassigned to the undersigned. Dkt. No. 262. In light of that
decision, and a procedural conflict, trial was advanced by one day to January 13, 2025. Dkt.
Nos. 264 & 266.

Nos. 269–272.  The parties then further stipulated, with the Court's approval, to

continue the trial to April 7, 2025 because of a schedule conflict with an expert

testifying for the Government.  *See* Dkt. Nos. 273 & 275.

On December 19, 2024, McCoy filed a motion for a 30-day extension of the

expert witness disclosure deadline—then set for December 23, 2024—on the

grounds that pretrial litigation "may very well lead to the dismissal of the majority

of the current counts on [sic] the Indictment."  Dkt. No. 308 at 1–2; Dkt. No. 275

at 3–4.  Noting that no motion to dismiss was then pending, the Court denied the

request.  Dkt. No. 309.  McCoy then timely filed a five-sentence expert witness

disclosure for Dr. Pablo Stewart—a purported expert on "sex addiction of

incarcerated individuals."  *See* Dkt. No. 310 at 1–2.

On January 13, 2025, the Government moved to exclude Dr. Stewart's

testimony, arguing, among other things, that McCoy's expert witness disclosure

did not meet the requirements of Federal Rule of Criminal Procedure 16.  Dkt. No.

316 at 2–4, 9–10.  In response, McCoy requested to re-open the expert witness

disclosure deadline and/or continue the April 7, 2025 trial date by 90 days, noting

that he had "only most recently been seen for the first time by Dr. Stewart on

January 7, 2025" and that "[t]here is no possible way Defendant would be ready

for trial by April 7th 2025."  Dkt. No. 324 at 1, 4–7.  On February 11, 2025, the

Court granted the Government's motion to exclude Dr. Stewart and denied

McCoy's request to re-open the expert witness disclosure deadline and/or continue trial, explaining that McCoy's barebones disclosure was far from sufficient under Rule 16 and, with less than two months to go before trial, he "ha[d] provided no evidence of good cause or due diligence which might warrant re-opening the witness disclosure deadline" or a "*sixth* continuance of the trial date." Dkt. No. 327 at 1, 5–11.

Undeterred, on March 12, 2025, McCoy filed yet another motion to continue trial—this time for six months—to allow him additional time to "prepare a complete defense." *See* Dkt. No. 338 at 5–16. The Court similarly denied that motion based on McCoy's continued inability to show diligence or good cause that might justify a further continuance. Dkt. No. 386.

Trial began on April 7, 2025. Dkt. No. 410. Of the five alleged victims, three testified for the Government, including Leimomi (aka "Minor Victim 1"), Raven (aka "Victim 2"), and Ariana (aka "Victim 4").[7] *See* Dkt. Nos. 415, 417, 418 & 422. During his cross-examination of Leimomi, McCoy repeatedly complained to the Court that the Government was "attempt[ing] to create an injustice" by unexpectedly having Leimomi testify inconsistently with her previous statements to law enforcement. *See* Tr. of Trial Day 6 at 87:25–90:5, Dkt. No.

---

[7]Stacy (aka "Victim 5") testified for McCoy, *see* Dkt. No. 450, while Temple (aka "Victim 3") did not testify, *see* Dkt. Nos. 454 & 455.

474. McCoy therefore requested that the Court adjourn the trial day early, as he was unprepared with the exhibits that he needed to support his impeachment efforts and required additional time to prepare the same. *See id.* at 89:1–90:5, 105:20–106:7, 109:17–19, 110:21–23, 117:6–7. Although the Court initially declined to do so, *see id.* at 90:6–11, 106:2–9, 110:24–111:7, 117:8–9, 118:10–119:1, 120:11–16, the Court later permitted McCoy to recall Leimomi over the Government's objection, further cross-examine her, and admit portions of her prior statements as exhibits. *See* Dkt. No. 443; Tr. of Trial Day 7 at 11:8–15:7, Dkt. No. 475; Tr. of Trial Day 8 at 4:21–15:15, Dkt. No. 476; Tr. of Trial Day 9 at 4:19–5:7, 7:7–9:9, 21:7–22:9, 31:11–57:18, Dkt. No. 477.

Following the close of the Government's case-in-chief, McCoy orally moved for acquittal, pursuant to Federal Rule of Criminal Procedure 29. Dkt. No. 436; Day 8 Trial Tr. at 30:17–39:22; Dkt. No. 444; Day 9 Trial Tr. at 59:6–60:2. The Court denied the motion. Dkt. No. 444; Day 9 Trial Tr. at 60:15–65:24; Dkt. No. 448; Tr. of Trial Day 10 at 66:23–67:19, Dkt. No. 478. McCoy then renewed his motion at the close of evidence. Tr. of Trial Day 11 at 79:14–19, Dkt. No. 479. Noting that there had been no change in facts or law that would warrant altering its prior ruling, the Court again denied the motion. *See id.* at 79:20–25.

Deliberations began on April 21, 2025. Dkt. No. 450. On April 22, 2025, the jury returned a verdict, finding McCoy guilty on fourteen of eighteen counts,

including: Count 1 (both sex trafficking of a minor and sex trafficking by force, fraud, or coercion); Counts 2, 4, and 5 (sex trafficking by force, fraud, or coercion); Counts 7, 9, 11, 12, 14, 15, and 16 (interstate travel or transportation in aid of racketeering enterprises); Counts 17 and 18 (obstruction of a sex trafficking investigation); and Count 20 (transportation for purposes of prostitution). Dkt. Nos. 451 & 452.

On May 4, 2025, McCoy timely filed a motion under Federal Rule of Criminal Procedure 33, seeking a new trial on Count 1 (sex trafficking of a minor). Dkt. No. 465. The Government responded in opposition on May 13, 2025, Dkt. No. 467, and McCoy replied on May 27, 2025, expanding his request to a new trial on all counts, Dkt. No. 481. Pursuant to Criminal Local Rule 12.2(a)(1), the Court elected to decide this matter without a hearing. Dkt. No. 466. This Order now follows.

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In considering such motions, "[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)

- 8 -

(quotation marks and citation omitted).  Although the decision to grant a new trial lies within the sound discretion of the district court, such motions should generally only be granted in those "exceptional cases" where "the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred[.]"  *See United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984) (citation omitted); *Alston*, 974 F.2d at 1211–12 (citations omitted).

## DISCUSSION

McCoy raises several arguments in support of his motion for a new trial: (1) the Court improperly denied his motions for a continuance, thereby depriving him of the ability to present a complete defense; (2) the Government "ambushed" him with Leimomi's testimony; (3) the Government misstated the law and improperly appealed to the emotions of the predominantly female jury during closing arguments; (4) there was a "severe conflict" in the jury's split verdict on Counts 6 through 16, and 17 through 19; and (5) the jury's verdict on Counts 1, 2, 4, and 5 was contrary to the weight of the evidence.  *See generally* Dkt. Nos. 465 & 481. The Court addresses each argument in turn.

## I.    Failure to Grant a Continuance

McCoy first argues that the interests of justice require a new trial because he had previously "requested multiple trial continuances all of which this Court

denied" and "[a]s trial progressed it became clear that the continuance Defendant

requested was required and should have been granted by this Court."  Dkt. No. 465

at 9; Dkt. No. 481 at 9.  Specifically, according to McCoy, "had this Court allowed

Defendant adequate time to acquire an Investigator, he could have and would have

been able to further discredit the alleged minor victim's testimony."  Dkt. No. 465

at 9–10; Dkt. No. 481 at 9–10.  In addition, McCoy claims that a continuance

would have afforded him time to obtain assistance from a paralegal—something

which he did not get "until the day of trial and that was Stand-by Counsel Gary

Singh's personal paralegal."  More time, according to McCoy, would also have

allowed his "expert to have adequate time to examine Defendant" and "gather his

mental health medical records for review[.]"  Dkt. No. 465 at 10–11; Dkt. No. 481

at 10–11.  As such, "[t]his Courts [sic] failure to grant said continuances violated

Defendants [sic] constitutional right to a fair trial and prevented Defendant from

putting on a complete defense."  Dkt. No. 465 at 12; Dkt. No. 481 at 12.

Each of these arguments is unavailing considering the record as a whole.  As

an initial matter, contrary to McCoy's representations, the Court *granted* most of

his requests for a continuance, including over the Government's objection, and

despite McCoy often playing games regarding his willingness to stipulate to the

same.  *See supra* 3–6 (summarizing).  That is why this case was tried in April

2025, more than a year after trial was initially set in April 2024.  It was only when

McCoy's requests for a *sixth* continuance of the trial date became manifestly
unreasonable—particularly considering the several warnings that the Court had
already given him and the disregard he had shown towards pretrial deadlines—that
the Court began denying McCoy's requests for further continuances, outlining its
reasoning for the same.[8]  *See, e.g.*, Dkt. No. 327 at 9–11; Dkt. No. 386.  And while
McCoy complains that the Court's denials of his repeated requests for
continuances were erroneous to the point of denying him his constitutional right to
present a complete defense, the specific consequences that he points to—*i.e.*, that
he was deprived of the timely retention of an investigator, paralegal, and expert—
are no one's fault but his own.  *See, e.g.*, Dkt. No. 133 (authorizing funding for a
paralegal on April 10, 2024, a year before trial); Dkt. No. 142 (approving the
hiring of psychologist or psychiatrist on April 11, 2024);[9] Dkt. No. 257 at 1 (noting
that the Court had authorized funding for an investigator by August 19, 2024).  Put
differently, McCoy's lack of diligence in utilizing the authority timely approved by
the Court leaves hollow his claim to the inability to present a complete defense.

---

[8]Of course, it is also notable that at the same time he was requesting continuances, McCoy was
demanding to go to trial "immediately" and insisting that he "d[id] not want to wait."  *See* Mar.
7, 2024 Hearing Tr. at 22:1–2.  No doubt, that was part of the reason the previously assigned
district judge referred to McCoy's conduct as "whipsaw[ing]."  Mar. 22, 2024 Hearing Tr. at
30:1.

[9]In addition, no continuance of the trial date would have cured McCoy's failure to be timely
examined by a mental health expert, given that the deadline to disclose expert witnesses closed
on December 23, 2024, and McCoy's *only* noticed expert—Dr. Stewart—was excluded due to
McCoy's failure to comply with the requirements of Rule 16.  *See* Dkt. No. 275 at 3–4; Dkt. No.
327 at 5–8.

*See* Dkt. No. 327 at 9–11; *United States v. Tsosie*, 532 F. App'x 705, 707 (9th Cir.

2013).  McCoy's motion for a new trial on this basis is therefore DENIED.

## II.    <u>Leimomi's Testimony</u>

McCoy argues that he is entitled to a new trial because "the Government

ambushed Defendant with the trial testimony of the alleged minor victim."  Dkt.

No. 481 at 12.  According to McCoy:

> [p]rior to the testimony of the alleged minor victim all discovery related
> to the alleged minor victim indicated that she claimed that she
> continuously engaged in prostitution for defendant for an extended
> amount of time however on the witness stand for the first time she
> claimed she only did one commercial sex act for defendant.

*Id.* at 12–13.  McCoy asserts that the Government was "aware of the amazing

change in her story[,]" yet nevertheless abdicated its "duty to document the

evolution of the alleged minor victims' [sic] story and report it to defendant or this

court or both so defendant would be prepared to impeach her."  *Id.* at 13.  In

addition, "[t]his court didn't help when they continued to sustain the governments

[sic] objections to defendant questioning the witness on if the government was

aware of the drastic changes in her testimony."  *Id.*  As a result, McCoy claims the

interests of justice require affording him a second chance to prove "this witness

testified falsely and is a pathological liar."  *See id.*

That argument is absurd.  At the outset, Leimomi's testimony could hardly

have been a surprise to McCoy given that she was the first witness disclosed on the

Government's witness list—filed nearly a month prior to trial on March 10, 2025—and indeed, was the subject of the very first count in the Indictment. *See* Dkt. No. 334 at 2; Dkt. No. 1 at 2. Moreover, although McCoy claims that the Court assisted the Government's "ambush" by limiting his cross-examination, *see* Dkt. No. 481 at 13, the Court, in fact, permitted him, over the Government's objection, to *recall* Leimomi and further cross-examine her with the claimed inconsistencies between her initial statements to law enforcement and her testimony on direct examination.[10] *See* Dkt. No. 444; Day 9 Trial Tr. at 4:19–5:7. The Court did so, despite McCoy's evident lack of preparation for his initial cross-examination of Leimomi. There is no dispute that the Government had produced all of Leimomi's pretrial statements to McCoy before the start of trial, and, thus, he should have been prepared to cross-examine her with any statements he perceived to be contradictory on the first day of her testimony. In short, any failure to effectively cross-examine Leimomi lies *solely* with the examining party—*i.e.*, McCoy. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (quotation marks and citation omitted)). To the extent

---

[10]In fact, by permitting recall, the Court granted McCoy additional days to prepare for cross-examination, which he would not have otherwise had. *See* Dkt. Nos. 436 & 444.

that McCoy "chose to represent [himself] and, after the reasonable opportunities
afforded by the court, chose tactics that left [him] poorly prepared to defend, that
was [his] choice to make."[11]  *United States v. Flewitt*, 874 F.2d 669, 673 (9th Cir.
1989).  McCoy's motion for a new trial based on the Government's so-called
"ambush" is therefore denied.

### III.   Closing Arguments

McCoy additionally claims that a new trial is warranted because the
Government deliberately engaged in misconduct during its closing arguments.
Specifically, McCoy asserts that "it is [] obvious that the Government misstated the
law to the jury during closing statements with regards to 18 U.S.C. 1591 Sex
trafficking by fraud, force or coercion and also that the Government wrongfully
appealed to the jurors' emotions, many of whom were women."  Dkt. No. 465 at
12; Dkt. No. 481 at 12.  Such actions, according to McCoy, were part of a
"strategy" to "manipulate the jury to find Defendant guilty based on unlawful
reasons."  *See id.*  Consequently, McCoy contends that the only remedy for the
alleged misconduct is to order a new trial.

McCoy's perception of the Government's closing arguments is far from
"obvious," and his insight into their unlawful strategy is both void of evidence and

---

[11]To this end, the Magistrate Judge repeatedly cautioned McCoy as to these types of
consequences when conducting his *Faretta* examination.  *See* Tr. of *Faretta* Hearing at 9:11–
10:2, 15:20–16:18, Dkt. No. 158; *see also* Day 6 Trial Tr. at 118:3–23, 120:11–16 (same).

speculative. As an initial matter, despite claiming that the Government

misrepresented the elements required to convict him of sex trafficking by force,

fraud, or coercion under 18 U.S.C. § 1591, McCoy never explains precisely *how*

the Government did so, nor what a correct statement of the law would have been.

*See id.* This is perhaps not surprising since the Government's closing arguments

tracked the jury instructions given and approved by the Court—instructions which,

as the Court explained to McCoy numerous times, "follow[ed] Ninth Circuit

Pattern Instructions, and . . . [were] a correct statement of law."[12] *See* Day 11 Trial

Tr. at 84:19–87:7, 106:2–22; Day 9 Trial Tr. at 141:25–142:1; Dkt. No. 435 at 2.

To the extent that McCoy disagrees with the Court and the Government's

understanding of 18 U.S.C. § 1591, he has provided *no* reason, other than

conclusory assertions that the legal error was "obvious," to support his claims.[13]

As a result, because McCoy has not identified *any* error in the Government's

recitation of the law on Counts 1 through 5—let alone error that would require a

new trial—and because the Court has not independently discerned any such error,

---

[12]Indeed, this may provide clarity as to why McCoy refuses to "site [sic] case law" in support of his argument. *See* Dkt. No. 465 at 12; Dkt. No. 481 at 12.

[13]Although not explicitly raised, to the extent this argument is an attempt to revive his "pattern" argument from *United States v. Todd*, 627 F.3d 329 (9th Cir. 2010), the Court maintains that McCoy's cabined reading of that case is incongruous with both common sense and Ninth Circuit precedent. *See* Day 8 Trial Tr. at 32:6–36:15; Day 9 Trial Tr. at 59:14–60:2, 60:21–61:22, 137:19–142:1. Moreover, even if McCoy was correct as to *Todd*'s holding, the same would not provide a basis for a new trial, as the victims underlying the counts on which he was convicted— Counts 1, 2, 4, and 5—came into his orbit *after* Temple, the victim underlying the count on which he was acquitted. *See* Day 10 Trial Tr. at 67:7–19; Dkt. No. 452 at 3.

McCoy's motion on this basis is denied.[14]

Likewise, McCoy's argument that the Government wrongfully obtained his convictions by appealing to the emotions of the (predominantly female)[15] jury is similarly unavailing. Notably, beyond vague allusions that the Government's "intention was always to appeal to the jury's emotions," McCoy provides no evidence, or even quotations, that would support such an interpretation of the Government's closing arguments. *See* Dkt. No. 465 at 12; Dkt. No. 481 at 12. Moreover, even if he had, the jury was explicitly instructed, on numerous occasions, that anything the parties said was not evidence, and that it was their "duty to apply the law as [the Court] [gave] it to [them], regardless of the consequences" and "base [their] verdict solely upon the testimony and evidence in the case, without prejudice or sympathy."[16] *See* Dkt. No. 446 at 3, 5; Day 11 Trial Tr. at 51:4–9, 52:15–16; Tr. of Trial Day 1 at 15:15–17, 20:15–20, 26:16–20, Dkt.

---

[14]It is also notable that McCoy *admitted* during his own closing arguments that "I believe Judge Watson did a very good job instructing you. You will have those instructions in deliberations to read as much as you want." Day 11 Trial Tr. at 117:1–3.

[15]Of course, McCoy had a direct hand in selecting the jury. *See generally* Tr. of Jury Selection, Dkt. No. 469. Moreover, this blatantly sexist argument is curious in light of his own representations during opening arguments that "no disrespect to the men in this courtroom, but I believe women are smarter than men because they have intellectual intelligence, but emotional intelligence, which allows them to be nurturing, easily make friends and know how to resolve issues without hostilities." Tr. of Trial Day 2 at 32:14–18, Dkt. No. 470. In other words, it appears that McCoy, not the Government, was attempting to pander to the predominant component of the jury.

[16]McCoy also warned the jury during closing arguments to the same effect—that, in his view, the Government was attempting to "trick you . . . because [] she is appealing to your emotions, despite the fact that you were just instructed that it would be a violation of your sworn duty to rely on sympathy in making your decision." Day 11 Trial Tr. at 117:21–25.

No. 468.  Thus, because McCoy provides no indication, other than his own

speculation, that the jury improperly relied on emotion, rather than the evidence, in

rendering its verdict, his motion for a new trial on this basis must also be denied.

## IV.    **Conflict in the Jury's Verdict**

McCoy further contends that a new trial is warranted in the interests of

justice because "[t]he jury's verdict showed they did not understand this courts

[sic] instructions which is easy for defendant to understand since this court was

mistaken with regards to the law on the key counts in the indictment."  Dkt. No.

481 at 13.  According to McCoy, the jury's verdict contained "severe conflict[s]"

as it "found defendant not guilty of counts 6 and 8 despite the fact these two counts

were identical to counts 7 and 9-14."[17]  *Id.*  Likewise, "the jury's verdict with

regard to counts 17-19 strains logic" because:

> [t]he jury found defendant not guilty of count 19 which was an
> allegation that defendant helped Ariana write an email to the
> government which was directly related to a sex trafficking investigation
> but found the defendant guilty for counts 17 and 18 which was an
> allegation that defendant directed the women to dispose of condoms
> while they were willingly working with defendant in prostitution the
> evidence showed this procedure was in place before any alleged force
> was used and therefor [sic] would not be fodder for obstruction of any
> 1591 count the other count related to defendant attempting to convince
> Raven to not plead guilty to an identity theft that she testified herself
> she did not do and this conduct was independent to any 1591 counts as
> that criminal conduct clearly took place before any for [sic] was

---

[17]McCoy's motion misstates the counts to which he was indicted and convicted.  As relevant to
Argument IV, McCoy was indicted on Counts 6, 7, 8, 9, 11, 12, 14, 15, and 16, and was
convicted of Counts 7, 9, 11, 12, 14, 15, and 16.  *See* Dkt. No. 1 at 4–5; Dkt. No. 452 at 5–7.

allegedly used while defendant was incarcerated.

*Id.* at 13–14. Such "inconsistenc[ies] in the disposition of various counts[]

suggests that the jury may have been affected by passion or prejudice or disabled

from giving entirely impartial and dispassionate consideration to the evidence." *Id.*

at 3. As a result, McCoy claims that he deserves a new trial on these counts.[18]

These arguments are frivolous. Notably, McCoy, as he fails to do

elsewhere, never explains precisely *how* the Court was "mistaken" regarding the

law, nor how any such errors would cause the jury to misunderstand or misapply

the Court's instructions.[19] *See* Dkt. No. 481 at 13–14. Even if he had, there is also

simply no conflict in the jury's verdict. For instance, although McCoy claims the

jury's verdict is suspect because its decision to acquit him on Counts 6 and 8 is

inconsistent with its decision to convict him on the "identical" Counts 7, 9, 11, 12,

14, 15, and 16, he ignores that, in reality, each of those counts alleged a different

victim, different facility of interstate commerce, and/or different date on which the

offense was purportedly committed. *See* Dkt. No. 1 at 4–5; Dkt. No. 446 at 35–43;

Day 8 Trial Tr. at 44:6–46:1. Likewise, while McCoy claims that the jury's

---

[18]McCoy also argues that the jury's verdict on Count 5 is inconsistent with the evidence
presented at trial. *See* Dkt. No. 481 at 13. Such assertions are more properly considered as part
of his argument that the jury's verdict lacked sufficient evidentiary support, and the Court
therefore addresses them in that section. *See infra* 27–29.
[19]In addition, McCoy never objected to the Court's proposed jury instructions on Counts 6
through 19, nor submitted his own version of the same. *See* Dkt. Nos. 386 & 414; Day 9 Trial
Tr. at 128:12–18, 137:11–139:20.

decision to convict him on Counts 17 and 18 while acquitting him on Count 19 "strains logic," Count 19 involved a distinct incident—*i.e.*, interfering with the Government's efforts to secure Ariana's testimony before the Grand Jury—which was completely unrelated to the conduct underlying the other two obstruction counts.[20]  *See* Dkt. No. 446 at 47–49; Day 8 Trial Tr. at 46:2–47:4; *see also* Dkt. No. 481 at 14 (acknowledging same).  As such, because Counts 6, 8, and 19 were predicated on an entirely *different* factual basis than their counterparts in Counts 7, 9, 11, 12, 14, 15, 16, 17, and 18, there is no inherent inconsistency in the jury's decision to acquit McCoy of the former while simultaneously convicting him of the latter.  McCoy's motion for a new trial based on the "severe conflict" in the jury's verdict is therefore denied.

## V.   Lack of Evidence

Finally, McCoy claims that he is entitled to a new trial on Counts 1, 2, 4, and

---

[20]Although somewhat unclear, McCoy also appears to claim that the jury's verdict on Counts 17 and 18 "strains logic" because the evidence at trial established that he had already "directed the women to dispose of condoms" and "attempt[ed] to convince Raven to not plead guilty to an identity theft . . . before any for[ce] was allegedly used[,]" and thus such actions "would not be fodder for obstruction of any 1591 count[.]"  Dkt. No. 481 at 14.  This characterization of the evidence is directly contradicted by the record which indicates both that McCoy instructed the victims to dispose of condoms to prevent law enforcement from uncovering his sex trafficking operation, and that his motivation in advising Raven was to avoid her cooperating with law enforcement and offering information on the same.  *See* Day 9 Trial Tr. at 62:18–63:12; Tr. of Trial Day 5 at 102:7–103:13, Dkt. No. 473; Tr. of Trial Day 3 at 107:19–108:9, Dkt. No. 471. As such, to the extent that McCoy relies on these arguments as an alternative basis for a new trial, his motion is denied.

5 because there is not a "single shred of evidence"[21] to support the jury's

"outlandish" verdict "with regards to all the 18 U.S.C. 1591 counts," and thus, he

experienced "a serious miscarriage of justice[.]"  *See* Dkt. No. 465 at 7–8; Dkt. No.

481 at 7–8, 13; *Alston*, 974 F.2d at 1211.  The Court addresses each count in turn.[22]

### a.    <u>Count 1 – Leimomi</u>

McCoy first claims that he is entitled to a new trial on Count 1 because "the

alleged minor victim's testimony does not meet the criteria of 18 U.S.C. 1591 sex

trafficking by fraud, force or coercion[.]"[23]  Dkt. No. 465 at 8; Dkt. No. 481 at 8.

According to McCoy, although Leimomi testified that she "did a commercial sex

date," she also stated that the "only force" she experienced "came when she

allegedly refused to give Defendant the money from that commercial sex act"

which was "the only sex act she ever performed with regards to commercial sex[.]"

---

[21]Because McCoy states that there is *no* evidence supporting the jury's verdict on Counts 1, 2, 4, and 5, the Court highlights only one or two pieces of evidence in support of each.  In doing so, the Court does not suggest that such examples are the *only* evidence in support of each count—they clearly are not—or that the jury relied solely on that evidence in reaching their decisions. Indeed, as a general matter, nothing could be further from the truth.  *See, e.g.*, Day 11 Trial Tr. at 87:8–106:1 (summarizing the evidence on Counts 1 through 5); Day 8 Trial Tr. at 40:16–44:5 (same).

[22]The "18 U.S.C. 1591 counts" consist of Counts 1 through 5, which allege sex trafficking by force, fraud, or coercion of: (1) Leimomi; (2) Raven; (3) Temple; (4) Ariana; and (5) Stacy.  *See* Dkt. No. 1 at 2–4.  Because McCoy was acquitted of Count 3 (Temple), *see* Dkt. No. 452 at 3, the Court does not address it further herein.

[23]Because McCoy makes no argument as to the evidence (or lack thereof) on Count 1 as it relates to sex trafficking *of a minor*, the Court does not consider whether he is entitled to a new trial on that charge.  *See* Dkt. No. 465 at 7–9; Dkt. No. 481 at 7–9; *see also* Day 9 Trial Tr. at 60:1–11 (acknowledging that there is sufficient evidence to establish Count 1 as it relates to sex trafficking of a minor).

*Id*. McCoy therefore argues that:

> as a matter of law based on [Leimomi's] own testimony Defendant would not be guilty of sex trafficking by fraud force or coercion as even if everything she testified to was taken as the truth there would be no evidence that force, fraud or coercion was used to compel her to engage in commercial sex acts only that force was used to take the money after she claims she willingly engaged in a commercial sex act.

*Id*. To be clearer, McCoy contends that the only force Leimomi testified to came *after* her one-and-only commercial sex act and, thus, that force could not have played a role in her engaging in that act.

This argument, however, both cherry-picks Leimomi's testimony and ignores that sex trafficking under 18 U.S.C. § 1591 encompasses not only the use of force, but also of fraud or *coercion*. Under the statute, coercion is defined, among other things, as including "threats of serious harm to or physical restraint against any person" as well as "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person[.]"[24] 18 U.S.C. § 1591(e)(2). And here, even assuming that McCoy is correct that the only "*force* [] used [was] to take the money *after* . . . she willingly engaged in a commercial sex act," Dkt. No. 465 at 8

---

[24]"Serious harm" in the context of 18 U.S.C. § 1591 is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity to avoid incurring that harm."  18 U.S.C. § 1591(e)(5).

& Dkt. No. 481 at 8 (emphases added), Leimomi testified that *before* she engaged in any commercial sex acts at McCoy's direction, she informed him that her father had sexually abused her, and he promised, in return, that "he knew people that would take care of the situation." *See* Day 6 Trial Tr. at 71:4–21. Such insinuations of violence towards a victim's family member are, by any sense of the phrase, "threats of serious harm." *See id.* at 86:4–5 (testifying that she was "scared of what [McCoy] would do to [her] and [her] family" if she did not do as he wished); 18 U.S.C. § 1591(e)(2)(A). As a result, because there is evidence establishing that McCoy coerced Leimomi into engaging in commercial sex by threatening her family with serious harm, his motion for a new trial on Count 1 (sex trafficking by force, fraud, or coercion) must be denied.[25]

### b.    Count 2 – Raven

Next, McCoy claims that he is similarly entitled to a new trial on Count 2 as "Raven's[] testimony did not leave room to find that the required elements have been met beyond a reasonable doubt." Dkt. No. 465 at 8; Dkt. No. 481 at 8. McCoy argues that "even if [Raven's] testimony is taken as completely true, . . . the evidence showed she willingly worked in commercial sex with Defendant" and

---

[25]Of course, this is not the only evidence indicating that Leimomi was coerced by McCoy prior to engaging in commercial sex on his behalf. *See, e.g.*, Day 6 Trial Tr. at 95:12–21 (testifying that she was "scared based on what [she] went with regards to [McCoy's] interaction with these other girls" including one incident where she witnessed McCoy "yelling at [a] small black girl" who "came back in the car and was not looking very happy.").

"there was no evidence that at any time Raven made [] a decision" to "change her mind." Dkt. No. 465 at 8–9; Dkt. No. 481 at 8–9.  In addition, "[t]he force used with regards to Raven was shown to not be relevant to prostitution," but rather was purely domestic violence in the context of their personal romantic relationship. Dkt. No. 465 at 9; Dkt. No. 481 at 9.  As such, McCoy asserts that "Raven's testimony is . . . flawed . . . [and] does not meet the requirements of 18 U.S.C 1591[.]"  Dkt. No. 465 at 8; Dkt. No. 481 at 8.

These arguments, however, not only flout common sense but entirely ignore the evidence presented during trial.  Specifically, regarding McCoy's first argument, the record is replete with evidence indicating that even if Raven initially agreed to voluntarily work in commercial sex, she later changed her mind.  *See* Day 3 Trial Tr. at 37:21–25, 171:10–172:18; Tr. of Trial Day 4 at 101:1–6, Dkt. No. 472.  Nevertheless, she was unable to leave because she "didn't believe we even had a choice, that we could just say no . . . there would be repercussions if we went against anything that [McCoy] said or wanted . . . [m]ainly physical."  Day 3 Trial Tr. at 137:21–138:1.  Put differently, "if [Raven] wanted to stop, when [she] wanted to stop, [McCoy] wouldn't allow it, [he] [was] controlling, [he] [was] abusive."  Day 4 Trial Tr. at 101:5–7.  As such, McCoy's argument that he is entitled to a new trial because the evidence showed that Raven willingly worked for him in commercial sex at all times necessarily fails.

- 23 -

Likewise, McCoy's second argument that the physical violence that he
perpetrated against Raven did not constitute "force" within the meaning of Section
1591 because it did not "involve[] money" and thus was unrelated to their
"business relationship" is equally absurd. Notably, even if the jury was somehow
able to distinguish between McCoy and Raven's "personal and business
relationship[s]"—something which McCoy himself struggled to do[26]—the
evidence nevertheless established that McCoy's physical abuse of Raven was not
limited to any interpersonal disputes, but rather frequently involved the so-called
"business" side of their relationship.[27] As just one example, Raven testified that
one night, while she was "walking, . . . working on the blade [in Waikiki], [] there
was a black guy who had said something to me." Day 3 Trial Tr. at 102:1–3. She
asked McCoy to pick her up and once he arrived, she informed him that "while
[she] was working, this guy . . . was bothering [her], like []—he was saying
something to [her]." *Id.* at 102:4–12. In response, "McCoy attacked [her] in the
rental car." *Id.* at 102:12–13; *accord* Day 5 Trial Tr. at 90:7–13. McCoy angrily

---

[26]*See, e.g.*, Day 10 Trial Tr. at 124:1–130:2.

[27]Nor, in any case, would McCoy's physical abuse against Raven in their "personal relationship"
foreclose the likelihood that the fear of such violence would force or coerce her to work in
commercial sex at his direction on the "business" side. *See* Day 11 Trial Tr. at 140:6–21; *see
also* Day 3 Trial Tr. at 171:10–172:18 (explaining that she continued to engage in commercial
sex because, among other things, she was afraid of McCoy); Day 4 Trial Tr. at 101:5–7
(testifying that she felt as if she could not leave because McCoy was "controlling" and
"abusive"); Day 7 Trial Tr. at 147:16–148:17, 150:4–21, 151:16–152:21, 155:24–25 (providing
expert testimony from Dr. Veronique Valliere as to such dynamics).

told her: "bitch, you're not supposed to be hearing what these [n*****] are saying to you.  You shouldn't even be listening to what he's saying to you."  Day 3 Trial Tr. at 102:14–16.  He then "proceeded to beat [her], grab [her] by [her] hair, slammed [her] head into the car door . . . [a]nd . . . elbow[ed] [her] in [her] back" before finally "dump[ing] [a] cold bottle of water on [her]," and "grab[bing] [her] by [her] throat[,] and [] choking [her] in the passenger seat of the car."  *Id.* at 102:17–103:7, 151:12–15.  After the attack, Raven's "upper lip was completely cut on the inside, [and] he had blacked both of [her] eyes."[28]  *Id.* at 103:5–7.  In addition, the "right side of [her] face" and "forehead even [were] completely swollen," the "vessels in [her] eye were all ruptured," she had "bruises on [her] neck [] from . . . [McCoy] choking [her]," as well as "bruises on [her] arms . . . from [] trying to use [her] arms to defend [her]self when [she] was crouching down in the seat while he was striking [her]," and she had "los[t] consciousness[.]"  *Id.* at 151:2–25; *accord* Day 5 Trial Tr. at 93:9–17.  Such violence was entirely divorced from any personal or romantic relationship between Raven and McCoy—instead, it was a direct reaction to Raven breaking the "rules of the game," including that she "wasn't supposed to hear [] what certain people were saying to [her]" and that "[she] [couldn't] do black dates, so like [she] couldn't do dates [aka prostitution

---

[28]Photos of Raven's injuries from this assault were admitted as Government Exhibits 217–225. *See* Day 3 Trial Tr. at 104:8–9, 149:23–150:3.

calls] with black guys." *See* Day 3 Trial Tr. at 100:22–101:4, 101:22–23; *accord*

Day 4 Trial Tr. at 9:11–15, 35:4–7; Day 5 Trial Tr. at 101:21–24; Day 9 Trial Tr.

at 78:20–79:9. Consequently, because there is simply no way in which this attack

was "not [] relevant to prostitution," Dkt. No. 465 at 9 & Dkt. No. 481 at 9,

McCoy's argument fails, and his motion for a new trial on Count 2 is denied.

### c. Count 4 – Ariana

McCoy further requests a new trial on Count 4, arguing that "[e]ven if

Ariana's testimony is taken as fact that Defendant tricked her to come meet with

him, there was no evidence that Defendant used 'fraud' to cause her to engage in

commercial sex for over 3 years while he was in prison." Dkt. No. 465 at 8; Dkt.

No. 481 at 8. As such, McCoy argues that there is no "room to find that the

required elements have been met beyond a reasonable doubt." Dkt. No. 465 at 8;

Dkt. No. 481 at 8.

This argument, however, once again ignores that sex trafficking under 18

U.S.C. § 1591 may be established not only by fraud, but also by force or coercion.

And here, even if McCoy did not use fraud to cause Ariana to engage in

commercial sex at his direction and for his benefit, there is a plethora of evidence

showing that he used both force and coercion to do so. For example, Ariana

testified that McCoy would threaten her, saying "[t]hat he knows people, and that

he would probably try to harm [her] if [she] tried to run away[.]" Day 5 Trial Tr.

at 94:14–17.  Such threats were particularly effective because McCoy had been

physically violent with her, thereby leading Ariana to believe that "he was capable

of [harming her] . . . because he had hurt [her] before[.]"  *Id.* at 88:2–5, 94:18–21.

In particular, Ariana explained that "if [she] didn't make the quota [,] [she] would

get yelled at.  And . . . [p]robably get beat."  *Id.* at 87:1–3.  Similarly, McCoy once

"choked [her] and put [her] up a wall" to the point where she "was on the verge of

losing consciousness" simply "[b]ecause [she] took too long with a . . . commercial

sex date" as well as "stomp[ed] on [her] head" and "stomach" because he was

"irate" with her on "one of the evenings after [she] [was] done working[.]"  *Id.* at

46:1–47:17, 88:7–15, 113:7–13; Day 6 Trial Tr. at 38:14–18.  As such, Ariana felt

as if she "didn't have a choice but to work for Mr. McCoy."  Day 6 Trial Tr. at

46:18–23, 52:19–21; *accord* Day 5 Trial Tr. at 47:14–17, 70:24–71:2.  And thus,

even without considering fraud, there is plenty of "room to find that the required

elements have been met beyond a reasonable doubt."  *See* Dkt. No. 465 at 8; Dkt.

No. 481 at 8; *see also* Dkt. No. 446 at 29 (setting forth the elements of Count 4).

McCoy's motion for a new trial on Count 4 is therefore denied.

### d.   **Count 5 – Stacy**

Finally, with respect to Count 5, McCoy claims that "the jury's verdict was

outlandish in light of [Stacy's] testimony" that he never "hit[,]" "attack[ed,]"

"threaten[ed,]" or "trick[ed] [her] into working in prostitution," and that "even if

- 27 -

they chose to disregard her testimony they would still be left with not a single

shred of evidence to support sex trafficking by fraud, force or coercion."   *See* Dkt.

No. 465 at 8; Dkt. No. 481 at 8, 13; Day 11 Trial Tr. at 7:22–24, 9:2–5.  McCoy

therefore argues that the trial must have gone "seriously awry," and a new trial is

necessary to correct this miscarriage of justice.  *See* Dkt. No. 465 at 3, 8; Dkt. No.

481 3, 8, 13.

        These arguments, however, blatantly mischaracterize the record.  Notably,

apart from Stacy's testimony, there were other witnesses who testified that they

observed or facilitated McCoy's use of force and coercion to compel Stacy to

engage in commercial sex at his behest.  For example, Raven testified that one

night, while McCoy was incarcerated, "[he] and Peaches [aka Stacy] got into it" on

the phone about not wanting "to go work" or "dragging ass on like getting out or

getting money when he flew her out there[.]"  Day 3 Trial Tr. at 60:25–61:16.

McCoy's brother, Anwar al Rasul (aka "Goode"),[29] then took the phone and Stacy

went to the bathroom "to tak[e] care of herself" and finish getting ready to work

that night.  *Id.* at 61:25–62:1.  McCoy, however, was still angry that Stacy was

"taking forever" and so "instructed his brother, Good[e], to put that bitch outside . .

. and don't let her come back until she had like . . . a thousand dollars or

---

[29]Al Rasul was indicted as a co-defendant in this case.  Dkt. No. 1 at 5.  He pled guilty to Count
10 pursuant to a Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement and is currently
serving a 22-month sentence.  Dkt. Nos. 59, 251 & 252.

something." *Id.* at 61:18–62:15.  And, on those directions:

> Good[e] busted into the bathroom while Peaches was on the toilet still, grabbed her by her top bun because her hair was wrapped up in a bun[,] [] dragged her from the toilet by her hair and threw her outside of the hotel room or AirBnB room into the hallway with no pants on or anything.  And there was people in the hallway, and, you know, Good[e] was listening to what [McCoy] was telling him to do.  So he— he dragged her out of the room.  And I remember I got up because I was like okay, this shit's like getting out of hand, like there's people in the hallway tripping.  So I remember, you know, I just grabbed her pants and some shoes, and her purse, and I just brought it to her, and I was like just put it on like because I didn't want—I didn't know what else [McCoy] was going to tell his brother to do if she came in and like, you know, gave him anymore pushback.

*Id.* at 62:15–63:5; *accord* Day 8 Trial Tr. at 90:14–91:7 (Goode testifying as to the same).  From such testimony, it is abundantly clear that McCoy "knew or was in reckless disregard of the fact" that by directing his brother to throw Stacy outside of the hotel room until she earned a certain amount, "force, threats of force, fraud, coercion, or any combination of such means would be used to cause [her] to engage in a commercial sex act."  Dkt. No. 446 at 30.  Consequently, because there is, at the very least, a "single shred of evidence to support sex trafficking by fraud, force or coercion," Dkt. No. 481 at 13, McCoy's motion for a new trial on Count 5 must be denied.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant Isaiah McCoy's motion for a new

trial, Dkt. Nos. 465 & 481, is DENIED.

IT IS SO ORDERED.

DATED: July 3, 2025 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

_United States v. Isaiah McCoy_, Crim. No. 23-00085-DKW-KJM; **ORDER
DEFENDANT'S MOTION FOR A NEW TRIAL**

- 30 -